Good afternoon. May it please the court. Rachel Miller Ziegler on behalf of appellant John Melnik. I'd like to reserve two minutes for rebuttal and I'll keep an eye on the clock. Mr Melnik suffered from an extremely severe case of hepatitis C. His doctors repeatedly referred him to the defendant who had to approve Mr Melnik before he could receive treatment. And the undisputed evidence that Mr Melnik needed that treatment as a medical matter and that qualified for it under prison policy. But inexplicably, the defendant didn't approve Mr Melnik for treatment after the first referral or the second or the third or the fourth. Instead, only after at least five referrals and 13 months had passed, did the defendant finally approved Mr Melnik for the treatment that everyone agrees he should have gotten all along. That delay violated the Eighth Amendment and because it would have been clear at the time that any basis whatsoever was deliberately indifferent, the defendant is not entitled to qualified immunity. What basis do we have in the record for concluding that the delay, whether excusable or not, resulted in damage to your client? Sure, so there's two sources of harm in the record that Mr Melnik's expert discusses. First, Mr Melnik experienced additional liver scarring during the period of delay that advanced to cirrhosis by June of 2016. That leaves him with a lifelong condition that exposes him to all sorts of risks, kidney disease, liver cancer, premature death. Additionally, there's a second category of delay that the defendant just ignores and that is harm that Mr Melnik suffered during the period of delay. He had aching knees, he his spleen became so swollen at one point that he actually sought out medical attention for it. All of that independently and certainly together is sufficient harm to state an Eighth Amendment claim. Notably, the defendant has just ignored that second category of harm on the theory that the Eighth Amendment only takes into account irreparable harm. On defendants theory, it would be acceptable for a prison to ignore months of excruciating pain so long as that pain would ultimately subside. That theory has no place in the Eighth Amendment. It's rebutted by the numerous cases that rely on non irreparable harm and for that reason the defendants experts conclusion about irreparable harm simply aren't enough for the defendant to win summary judgment on that basis. I'd like to start by talking about qualified immunity as that was the basis for the district courts decision below. The defendant has conceded that hepatitis C is a serious medical need. Numerous cases held as much as of 2016. It means the only real question is whether it would have been clear that the defendants response to that need constituted deliberate indifference. Two principles would have made that very clear. First, delaying necessary medical care without any basis violates the Eighth Amendment and second, delaying medical necessary medical care for non-medical reasons violates the Eighth Amendment. The defendant doesn't disagree that the cases establish these principles. He's instead argued that they define the clearly established right at too high a level of generality but this court and others have relied on either those exact principles or things that are very very similar. For example, the Fifth Circuit in Delaware, the Eleventh in Melton, this court in the Third Circuit and unpublished decisions in Egberto and Abu-Jamal. Importantly, those are all very recent decisions from between 2016 and recent admonitions to define the clearly established right at an appropriate level of generality. And they also follow from the Supreme Court's explanation of how to determine whether a right is general enough or excuse me, too general. The court has said that a right is too general if the unlawfulness of conduct doesn't follow from the rule. That's why a rule like don't be deliberately indifferent or have probable cause is not specific enough. It's not clear from stating the rule whether an official has violated it. That's not the case with the principles we've set forth. The rule is there needs to be some reason for delaying medical care. The defendant didn't have one so his actions were unconstitutional. There's no gray area where what he did could be a constitutional under the principles that we've laid out. Unless there are any questions about qualified immunity, I'll turn back to the merits. As I've noted, the defendant has conceded that hepatitis C is a serious medical need. He's offered three arguments to defend his conduct. First, the harm issue that we've already discussed. Second, he said he didn't know about Mr. Melnick's condition. And third, he said that there were reasons for his delay. Those reasons don't hold up to scrutiny. First, as to his knowledge, there is abundant record evidence from which a jury could infer that the defendant did know about Mr. Melnick's condition. There are many referrals in the record. There is the he also denied Mr. Melnick's second level grievance complaining about the hepatitis C treatment that Mr. Melnick was receiving. All of that is enough for a jury to find knowledge. Turning to the defendant's final argument, he said there were reasons for delay. He's asserted those reasons in his legal filings. But I think a jury could and probably would on this record find that the defendant didn't actually delay for those reasons and that the delay was that DAAs, the drug my client received, became available during the relevant period. With respect, that's just wrong. DAAs were first introduced in 2011. They became widely available in 2013. Harvoni, the specific drug that Mr. Melnick received, was approved by the FDA in 2014. And most important here, as defendant admits, page 42 of his brief, NDOC started using Harvoni for patients with an APRI score above 2.0, patients like my client, in 2015, which is a full year before the relevant delay here. The second reason that the defendant has offered for his delay is that Mr. Melnick's APRI score went above and below 2.0. There's a couple of problems with that. First, there's nothing in the record to support it. And asserting it in the defendant's legal filings does not create a basis or does not create evidence sufficient for summary judgment. But the second problem is that, in fact, the evidence in the Mr. Melnick, excuse me, the defendant's own expert specifically addressed this fluctuating APRI score issue and said that that wouldn't be a basis to delay treatment. So given all that, I think the jury could find here that there was no basis for a delay, that the delay was entirely inexplicable, and that therefore this case falls into the well-recognized rule that delaying necessary medical care without any basis is unconstitutional. Unless there are further questions, I'll reserve the remainder of my time. Okay, let's hear from the other side, and then you will have a chance to respond. Good morning, Your Honors. May it please the Court, my name is Greg Zanino, and I am a Deputy Solicitor General with the Nevada Office of the Attorney General, and I'm appearing on behalf of Dr. Aronis. And as you know, summary judgment was granted for Dr. Aronis on grounds of qualified immunity. So I'll address that, I'd like to address that first. You know, and I would start by submitting that the plaintiff's case or the appellant's case in this matter is based almost entirely upon a mischaracterization of the administrative directive that's at issue in this case. It's under scrutiny, and that administrative directive appears beginning at page 51 of volume 2 of the excerpts of record. And it's really a very simple directive. It provides a system for prioritizing the delivery of care, specifically direct acting antivirals to inmates who are suffering from HCV. And that's all it is. It simply establishes a priority system, and in section 1 of that administrative directive, it lists the criteria that should be used when a physician decides how to prioritize treatment for inmates. May I ask, I mean, whatever we might make of the directive, what are we to do with the expert, Dr. Hellerstein, who is your expert, who said that the denial of treatment was inconsistent with the policy and with the standard of care? So what do we do with that? You know, I think that the directive may very well be inconsistent with the standard of care, which is a tort concept. But technically, I think that Dr. Arenas did exactly what this point is that your expert says he didn't. Dr. Hellerstein said that the denial was inconsistent with NDOC policy. Was he wrong about that? Or, I mean, or admit, and even if he is, doesn't that at least create a dispute of fact on that question? He's wrong on that one count, right? And I think that the regulation speaks, or not the regulation, it's a directive, it's a protocol, and it speaks for itself. And the facts speak for themselves. And so we know, like, in terms of factual matter, Dr. Arenas met with the plaintiff in August of 2016, and he told him, you'll be treated soon. He said, essentially, he told him, you're on the list for treatment, right? We're going to treat you. Hang in there. You know, help is on the way. And that does not in any way illustrate kind of any type of malice or deliberate indifference towards- Well, that doesn't, but the fact that he then did not, in fact, treat him, seems like it arguably does, doesn't it? But, you know, and we made this point in the brief, is he's not the treating physician, right? And we don't know why there was this delay. I mean, there's no evidence in the record one way or the other concerning, like, the 10 months that passed between this August 10th interaction with the plaintiff and the actual treatment that occurred. So there was roughly 10 months that passed. And I think we can infer, based upon the directive itself, that there was some rationing of healthcare that was going on there. And I would submit that there's nothing in the directive itself that would suggest that it's unconstitutional. And there's no case law currently, and there was no case law at the time that would suggest that the directive, you know, the notion of rationing healthcare based upon a presumably scarce resource, right? We're talking about relatively new antivirals, relatively new pharmaceuticals. I think the only relevant scarcity in terms of providing this drug was scarcity of money from the state of Nevada. There's nothing on the record that shows the drug was unavailable. Well, and I would agree that I think cost is a function ultimately of scarcity, right? But I mean, the legislature could have come in, right, I suppose, and granted, made an stock of these antivirals. But let me say this. It's not a defense to a deliberate indifference case when medical care is at issue. If we have a serious medical condition that requires immediate or quick treatment, and is not given, it's not a defense to say, well, we chose not to spend the money. Well, I think there is certainly an action, there would certainly be an action for injunctive relief, right? I mean, if the regulation or the directive itself is unconstitutional, you have an action potentially for injunctive relief, and you force an appropriation of funds. But to sue Dr. Aaron is for monetary damages is an entirely different matter, right? And ultimately, you have to prove one that there was deliberate indifference. And there's there's nothing in the record one way or the other that suggests that that Dr. Aaron is was was responsible for this 10 month delay that occurred between the time that Dr. Aaron is put. Was he was he nowhere in the chain of command in terms of approving treatment? The you know, the directive itself doesn't deal with approval. There's no there's no I'm not I'm not asking. I'm not. Excuse me. I'm not asking about the directive. I'm asking a different question. Was he nowhere in the chain of command in terms of approving treatment? He was on the committee that decided kind of prioritize. That's well, there you go. But I do not believe that that he was. And there's no evidence to this effect that he was responsible for rendering treatment or procuring the drugs in question, or any of the other things that went into the, you know, to ultimately to the delivery of the the DA is in in June of 2017. I mean, I mean, he's very high on the chain of command, right? He's right. He's right up there at the top. He was the medical director for a time, I think, which brings us back to the question of personal kind of responsibility. And I mean, if if if we're going to hold Dr. Aaron is kind of what we're essentially doing is asking him to serve or requiring him to serve as a proxy for for what was an institutional issue was was basically an institutional in charge shortcoming, right? Wasn't he in charge? I think the fact that someone's in charge doesn't mean that they're personally responsible for for a delay that occurs at a level well below his level. The district court, I mean, we're reviewing a grant of summary judgment that was not based on a lack of personal involvement, was it? Well, I think it was, again, that that takes us back to the directive. I mean, the directive was, there's nothing to suggest that the directive was unconstitutional. No, I relied upon the directive. Okay, but you're sort of now you're switching back to a different I'm just following up on the personal involvement issue. And I take your point that, you know, there's not supervisory liability, the plaintiffs are going to have to show that Mr. Dr. Aaron is personally did something. But on the record that we have before us now, I guess I'm not it's not clear to me how we can say for sure that he didn't. So my question is what why isn't that something that needs to be explored further? In this litigation? Well, I mean, granted, there's overlap between this question of whether there was deliberate indifference and whether there was qualified immunity. I mean, the second part of the deliberate indifference analysis in the first part of the qualified immunity analysis are essentially the same, right? Was there a constitutional violation, right? And if there was a constitutional violation, and I would submit that there was not. But even if there was, right, that there was, Dr. Aaron has had every reason to believe that he was within the constitutional standards by by prioritizing care, according to this directive. And I would submit that's exactly what happened. May I interrupt you there once more? I mean, I we've gone over this again, but I just want to know that you keep saying he was complying with the directive. And like, for us to evaluate that is kind of hard, given our lack of medical expertise. But your expert said to you, what he did was not consistent with the directive. So how can we say that it was? What's the evidentiary basis in this record for us to say that he complied with the directive? Well, I mean, assuming that that he took some action that assuming that the delay, and I think that's what the expert was referring to was the delay in treatment was, was inconsistent with the directive. But the problem with that is the directive itself doesn't establish timelines for treatment. It just, it just directs the Department of Corrections to kind of marshal their resources and prioritize treatments. And that's what happened. And, and, you know, it turns out that within those, that group of inmates that qualified for treatment, because they had an APR, I score of two, he was apparently kind of not, not a not a first priority. And, and, you know, ultimately, that, you know, I think in retrospect, that was, that was probably a reasonable decision, because, you know, Mr. Mr. Malik got better, right? And he's experiencing those symptoms now. So, so I mean, and granted, I think he experienced some discomfort, right? You know, and the records indicate that there was discomfort, but there, there was no severe pain. And the question about whether, you know, this delay actually caused damage to his liver is entirely speculative. And I think both experts agree, and we pointed this out in a brief that, that scarring takes place over over a period of years. So it's very difficult to say that, that the delay in treatment was the cause of an injury. Well, difficult to say is different from impossible to say or beyond any reasonable dispute. We're in summary judgment. So you may think that it's speculative. But I think there's some evidence in the record that there was harm resulting from the delay. And that's enough on that question to survive summary judgment. But, but, but I disagree with that, Your Honor. And here's why. Because the second part of that, that delivered indifference inquiry is a subjective inquiry. So we have to ask, you know, what, what would Dr. Aronis have perceived, would he have perceived that that a delay was going to was going to cause, you know, harm to his liver. And I think it was reasonable for him to perceive, based upon the expert reports in this case, as well as the directive, that that delay of 10 months would not cause an injury. And in fact, delay was a little longer than 10 months. You're well over time. Do you have any summing up remarks? No, Your Honor, I do not. Thank you. Okay, thank you very much. And you've saved some time. Thank you, Your Honor. I just like to make three points. First, as to the defendant's arguments about whether or not he violated the directive, as Judge Miller has referenced, defendant's own expert concluded, and this is at page 20 of the record, it is my opinion as an expert in correctional health care, that the NDOC HCV committee's denials of HCV treatment after March of 2016 were inconsistent with the NDOC policy. That is certainly enough to create an issue, a fact issue for summary judgment, and to show that the defendant would have recognized the seriousness of Mr. Melnick's condition. And the fact that he violated that policy helps highlight how egregious his conduct was in refusing to approve Mr. Melnick for treatment. That brings me to the second point I'd like to make, which is that the defendant has said that he met with Mr. Melnick in August, said we'll treat you soon, and there's nothing to explain the subsequent delay in treatment. And that's precisely the problem for the defendant. In saying that we'll treat you soon, that is one of the many pieces of evidence that a jury could use to find that the defendant was subjectively aware of the serious risk to Mr. Melnick. And there is nothing in the record to explain that subsequent delay. The defendant could have approved Mr. Melnick for treatment in April, in August, in September, in any period during that 13-month delay, and he didn't. Now the defendant has suggested during his argument that he wasn't personally responsible and that perhaps somebody else was responsible. But I think that's directly rebutted by his interrogatory responses at page 98 of the record. He's asked, specifically identify and give the full name of each member of the HCP and URP who approved Mr. Melnick for hep C treatment. And then his response is, it was me as the chair of the hepatitis C committee that approved Mr. Melnick for treatment. That is certainly enough for a jury to conclude that the defendant could have made that approval decision long before he ultimately did in May 2017. Third and final point is with respect to the defendant's arguments about the scarcity of this drug. There is absolutely nothing in the record to support the idea that Mr. Melnick didn't receive this drug because of cost. And in fact, what the NDOC did here was it did prioritize treatment. It made a decision that very few patients were going to get this sort of care. Perhaps that was because of cost. We don't know. But the prioritization protocol that it chose prioritized patients like my client. And yet inexplicably, the defendant didn't do anything for Mr. Melnick for over a year despite his very serious condition. For all of those reasons, we'd respectfully request that the court reverse the district court's decision unless there are any further questions. Thank you. Okay, thank you. Before we quit, Ms. Miller-Ziegler, I believe you're doing this as a pro bono argument. Yes, Your Honor. I would like to thank you on behalf of the court for doing this. People who step up and do this pro bono argument are very helpful to the court. And I thank you on behalf of the court. And I would say similarly nice things to you, Mr. Zeno, except that you're being paid. So I want to acknowledge the very helpful role that pro bono lawyers like you play for our court. The case of Melnick v. Aranus is now submitted for decision.
judges: SCHROEDER, FLETCHER, MILLER